UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MIGUEL ANGEL DELGADO,

       Plaintiff,

v.                           Case No. 2:09-cv-01252

DAVID BALLARD,
CLARENCE J. RIDER,
JAMES McCLOUD, and
CHARLENE SOTAK,

       Defendants.

PROPOSED FINDINGS AND RECOMMENDATION

The plaintiff[1], an inmate at Mount Olive Correctional Complex ("MOCC"), filed this action on November 16, 2009, complaining that prison officials are violating his civil rights with respect to his religious beliefs. Pending before the Court is the defendants' motion for summary judgment (ECF No. 75), supported by exhibits and a memorandum (ECF No. 76). David Ballard is Warden of MOCC, Clarence Rider is MOCC's Religious Services Coordinator, James McCloud is the Captain and Segregation Commander of the unit where

---

[1]The plaintiff is serving a sentence of life imprisonment without possibility of parole upon his conviction of the first degree murder of Robyn Renee Richardson. State v. Delgado, No. 02-F-53 (Cir. Ct. Berkeley Cnty, W.Va. Aug. 13, 2004). The victim was stabbed 23 times and strangled in June, 2001. "Man sentenced to life in prison," Martinsburg Herald Mail, http://articles.herald-mail.com/2004-08-14/news/25015102_1_miguel-delgado-guilty-verdict-dna-testing (last checked Aug. 24, 2011).

the plaintiff is housed, and Charlene Sotak is the Inmate Grievance Coordinator for the West Virginia Division of Corrections.

The plaintiff received a <u>Roseboro</u>[2] notice (Order entered September 28, 2010, ECF No. 44).  He filed a response with exhibits (ECF No. 89), and an excessively lengthy "brief" with additional exhibits (ECF No. 90).  The defendants filed a reply (ECF No. 94), and the plaintiff, who apparently must always have the last word, filed a surreply without leave of court (ECF No. 96).

As set forth in the Order entered September 28, 2010 (ECF No. 44), the causes of action which remain in this action are these:

1.   Declaratory and injunctive relief on the plaintiff's RLUIPA claim that the defendants in their official capacities and Operational Procedure # 5.08 violate the plaintiff's right to practice and freely exercise his Taino-Arawak Native American (Puerto Rican)[3] religion without substantial burden;

2.   Declaratory and injunctive relief on the plaintiff's § 1983 claim that the defendants in their official capacities and Operational Procedure # 5.08 violate the plaintiff's right to equal protection of the law;

3.   The plaintiff's § 1983 claim for money damages against the defendants in their individual capacity based on his assertion that

_____

[2] <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975).

[3] The Taino and Arawak Indians inhabited the islands of Hispaniola (present day Haiti and Dominican Republic) and Puerto Rico before the Spanish explorers arrived in the 15th century.

2

the defendants and Operational Procedure # 5.08 violate the plaintiff's right to equal protection of the law; and

4.   Declaratory and injunctive relief on the plaintiff's § 1983 claim that the defendants in their official capacities have retaliated against the plaintiff based on his exercise of his First Amendment right to petition for redress of grievances.  ECF No. 44, at 1-2.

In evaluating summary judgment motions, Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c)(2) (2009).  Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.

Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

If the moving party meets this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c)(2); Id. at 322-23.

> [A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

RLUIPA Claim

The Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § 2000cc-1(a), provides:

> No government shall impose a substantial burden on the
> religious exercise of a person residing in or confined to
> an institution . . . even if the burden results from a
> rule of general applicability, unless the government
> demonstrates that imposition of the burden on that person
>                          * * *
> (1) is in furtherance of a compelling governmental
> interest; and
> (2) is the least restrictive means of furthering that
> compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

The defendants have provided two versions of MOCC Operational

Procedure ("OP") #5.08 - Religious Programs, one dated February 1,

2008 (ECF No. 75-1, Ex. 1), which was cancelled and succeeded by a

version dated July 1, 2009 (id., Ex. 2).  The two versions are not

markedly different; the plaintiff is not directly challenging any

particular provision that was changed from 2008 to 2009; rather, he

challenges their effect on him and his beliefs.  Among other

matters, OP #5.08 addresses religious diets, religious items, use

of the chapel, and Native American religious practices including

use of tobacco mixtures.

The plaintiff complains that the defendants are violating his

RLUIPA rights to practice his Taino-Arawak religion without

substantial burden in four respects: hair length; tobacco use;

access to music; and correspondence with outside groups.  More

specifically, the plaintiff wishes to grow his hair long on the

back of his head, use fresh, loose tobacco without mixing it with

red willow bark or other substances, listen to music and dance in

his cell as much as he wants, and correspond with certain groups outside the prison.

**Hair Length**

The plaintiff claims that his religion mandates that his hair be worn short around his face and long on the back of his head. "I am required by my religion to grow out my hair long in the back, short in the front as is Taino culture to be closer to the Creator." (Affidavit, ECF No. 89-1, ¶ 10, at 5.) Contrary to this assertion, he has provided an exhibit which states:

> In Taino culture, developed on tropical islands, it was not the custom for our ancestors to wear long hair. Hair was cut, bowl-shape, around the head, ocassionally [sic] with a lock of hair tied at the crown of the head.
> In the island of Kiskeya (Dominican Republic) there also lived a small community of people which spoke a language different from ours, and our grandfathers called them "ciwaiu," which means "men with long hair," because it contrasted with our own ancestral custom of cutting the hair short.
> The ciwaiu also cut their hair in the same way we Tainos did, but kept it long at the back, sometimes holding it in a hair net adorned with beautiful feathers.
> Taino women carried their hair long, and at areitos they attached live fireflies to the hair, keeping them there with a hair net.
> Today, we recommend the ancestral custom. Individuals are free, however, to make their own decision as to how they want to wear their hair.

(ECF No. 90-3, at 17.)  The Court assumes that the plaintiff has decided that he "must" wear his hair long in the back.

MOCC's grooming policy (No. 334.01) is found at ECF No. 75-1, Exhibit 3. It provides that "[h]air length will not exceed the top of the collar or ears, be no more than three (3) inches on top and

be kept neat and clean.  Hair will have a tapered appearance and

may not be blocked."  Warden and defendant David Ballard has

submitted an affidavit which states, in pertinent part, as follows:

> 4.  That I am familiar with the Division of Corrections'
> grooming standards which do not permit male inmates to
> wear long hair.
>
> 5.  That the grooming standards are necessary to preserve
> security as long hair can be used to conceal weapons or
> other contraband.
>
> 6.  That the grooming standards also are necessary to
> preserve public safety by preventing escaped inmates from
> easily altering their appearances from the photographs
> kept at the institution.
>
> 7.  That the grooming standards further institutional
> security and safety through preventing inmates from
> expressing gang affiliations through hair length or
> styles.
>
> 8.  That there is not a less restrictive means of
> addressing these security concerns with respect to
> grooming.

(ECF No. 75-1, Exhibit 4.[4])

The defendants argue that their security concerns with long

hair are justified burdens on the exercise of an inmate's faith.

(ECF No. 76, at 6.)  In their reply (ECF No. 94, at 1-2), they cite

to and rely on several unpublished opinions (copies of which were

provided to the plaintiff), all of which uphold prison officials'

---

[4]  Warden Ballard has submitted another affidavit, in
support of the defendants' opposition to the plaintiff's motion
for a temporary restraining order, which provides additional
detail regarding the items and substances which inmates may hide
in long hair, thereby compromising safety and security.  ECF No.
109-1.

positions that prohibitions on long hair and beards are the least restrictive means of furthering the government's compelling security interest.  In Couch v. Jabe, 2011 WL 1542573 (W.D. Va. Apr. 21, 2011), the district court considered and approved a policy which requires noncompliant inmates to be transferred to segregation, rather than forcibly shaving them; accord, Braithwaite v. Hinkle, 752 F. Supp.2d 692 (E.D. Va. Sept. 20, 2010), aff'd, 412 Fed. Appx. 582 (4th Cir. Feb. 24, 2011).

The plaintiff filed a sur-reply (without leave of court), which contends that Couch and Braithwaite are inapposite because they concern shaving, not hair length.  (ECF No. 96, at 1-2.)

In 1998, prior to the enactment of RLUIPA, in a case brought by Muslims, Rastafarians, Native Americans and other individuals, challenging the South Carolina Department of Corrections grooming policy for all inmates, the Fourth Circuit ruled that the policy did not violate the inmates' right to free exercise of their religious beliefs.  Hines v. South Carolina Dep't of Corrections, 149 F.3d 353, 356 (4th Cir. 1998).  The policy required male inmates to keep their hair short and their faces shaven, unless an inmate had a doctor's excuse with respect to shaving.  Id.  The Fourth Circuit assumed that the policy infringed on the inmates' sincerely held religious beliefs.  The court then addressed whether the policy was reasonably related to legitimate penological interests.

> First, the record is clear that the Grooming Policy
> was enacted to suppress contraband, limit gang activity,
> maintain discipline and security, and prevent inmates
> from quickly changing their appearance.  It cannot be
> gainsaid that these are legitimate - indeed compelling -
> governmental and penological interests.

Id. at 358.

After the enactment of RLUIPA, the standard of review changed. As explained in Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009), the issue now is whether the subject policy or rule imposes a substantial burden on religious exercise, that is, whether it puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs, or . . . forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits on the one hand, and abandoning one of the precepts of her religions . . . on the other hand."  The Fourth Circuit concluded that "the policy requiring Smith to cut his hair - and implementing that policy with physical force - compelled him to modify his behavior in violation of his genuinely held religious beliefs," and therefore substantially burdened Smith's religious exercise.  Id.  Once a burden has been shown, the prison authorities bear the burden of persuasion that the policy furthers a compelling governmental interest and is the least restrictive means of furthering that interest.  Id. at 252.  The first step is to explain the reasons for the policy (what is the compelling governmental interest).  Id. at 253.  The second step is to demonstrate that the policy is the least restrictive means of

furthering that interest.  Id.  "In other words, the SCDC must provide a substantive, relevant explanation as to why drastic haircuts, administered through physical force, are the least restrictive means of enforcing the compelling interest advanced." Id.

As to both elements (compelling governmental interest and least restrictive means), due deference must be given

> to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."

Id. at 252, 253 (quoting Cutter v. Wilkinson, 544 U.S. 709, 723 (2005)).  The Fourth Circuit remanded the case for further proceedings.  Id. at 254.

On remand and after further proceedings, a magistrate judge filed a Report and Recommendation that the defendants' renewed motion for summary judgment be granted, based in significant part on the affidavits of Robert E. Ward, Direction of the Division of Operations for the Department of Corrections, and Gary Lane, Associate Warden of the Tyger River Correctional Institution and former captain of the Maximum Security Unit in which Kevin Smith is housed.  Smith v. Ozmint, No. 9:04-01819-PMD-BM, 2010 WL 1071388 *2-*5 (D.S.C. Jan. 25, 2010).  Smith filed his own affidavit concerning his belief that growing his hair is "one of the most sacred tenets of my religion," and noting that he has previously

10

grown his hair "without incident." Id. at *10.

The magistrate judge's Report found that there is a compelling governmental interest for the grooming policy, noting "the Defendants in their evidence have set forth numerous examples showing the importance of maintaining the SCDC's grooming standards." Id. at *12.

> The testimony of Ward and Lane, both experienced prison officials with long histories of dealing with potentially violent and recalcitrant inmates, establishes that the grooming policy promotes security and discipline as well as the health and safety of both inmates and staff.

Id. The affidavits list the numerous risks of long hair and beards: hiding contraband, using disgusting substances on hair to discourage searches by guards, attracting lice and scabies, using it in a fight, and concealing facial features. Id. at *3-*5.[5] The prison officials note the necessity of having uniform rules for all inmates in an institution and enforcing compliance with those rules. Id. at *5.

The magistrate judge's Report found that the South Carolina Department of Corrections had further shown that "the grooming policy is the least restrictive means of furthering that compelling governmental interest." Id. at *12. He wrote that "Plaintiff is not an island until himself, to which the grooming policy can be altered or modified while remaining in place for other inmates."

---

[5] These same concerns were cited by Warden Ballard in his affidavit in opposition to the plaintiff's motion for a temporary restraining order.  (ECF No. 109-1.)

Id.

> [S]uch a policy exception would force MSU [Maximum
> Security Unit] officials to determine which inmate has a
> sincere belief and which does not, putting officials in
> an impossible situation and subjecting them to even more
> lawsuits, would impose different standards for
> incarceration on different inmates leading to conflict
> and confrontation, and would disrupt and even jeopardize
> the operation, safety and continuity of the MSU.

Id.

The presiding district Judge (Duffy, J.) reviewed Kevin Smith's objections to the Report and Recommendation, conducted a *de novo* review, agreed with the Report and Recommendation, and granted the defendants' motion for summary judgment. Id. (Order entered March 18, 2010, ECF No. 307.)

Kevin Smith appealed. The Fourth Circuit reviewed the record and concluded that the defendants established entitlement to summary judgment for the reasons stated by the magistrate judge and the district court. Smith v. Ozmint, No. 10-6526, 396 Fed. Appx. 944, 2010 WL 3760233 (4th Cir. Sept. 23, 2010).

The undersigned recognizes that the Fourth Circuit discourages citations to unpublished opinions. However, the similarity of the facts in Smith to the instant case make it persuasive authority on which to rely. Both Smith and Delgado are housed in extremely secure units in which inmates are locked down 23 hours a day, and permitted out of their cells only in restraints. Both Smith and Delgado have been convicted of offenses involving violence and are serving lengthy sentences.

Warden Ballard's affidavit sets forth persuasive reasons as to why a religious exemption for hair length and shaving would not work.  If such an exemption were permitted, more inmates would claim the exemption, whether or not they have sincerely held beliefs, thereby increasing the likelihood of expensive litigation and the need for additional staffing.  The above-listed safety and health concerns would increase with each exempt inmate, and the concern for alteration of appearance would not be addressed.

In another unpublished decision, <u>McRae v. Johnson</u>, No. 06-7548, 261 Fed. Appx. 554, 558, 2008 WL 80202 (4th Cir. Jan. 7, 2008), an action brought by Muslims and Rastafarians challenging grooming requirements, the Fourth Circuit found that "the district court's conclusions of law that, in the prison setting, suppression of contraband, maintaining discipline and security among the inmate population, maintaining the health and safety of inmates and staff, and preventing prisoners from quickly changing their appearance constitute compelling governmental interests."

> We note that one of the key features of the VDOC's Grooming Policy that supports the district court's least restrictive means conclusion is that the VDOC's Grooming Policy does not mandate the forcible cutting of an inmate's long hair and/or beard.  Rather, an inmate is allowed to keep his long hair and/or beard.  If he does so, however, he is quite reasonably required to live in a segregated housing unit (without access among inmates housed in such unit) where the safety, security, and health risks created by long hair and beards can be lessened by more restrictions on the inmate.

<u>Id.</u> at 559.  "Continuous violation of the VDOC's Grooming Policy

13

also subjects an inmate to possible reclassification to a higher security level and a reduction in good conduct credit. <u>Id.</u> at 556.

The undersigned notes that the plaintiff is and has been housed in the administrative segregation unit, although the reason for his being segregated is not in the record. He is not eligible for good conduct credit; he is at the highest security level. Thus it appears that the plaintiff's refusal to have his hair cut simply prolongs his stay in administrative segregation indefinitely, which does not seem to bother him.

The plaintiff is focused on himself, not on broader issues of prison security, health and safety. The photographs taken most recently of the plaintiff are to be found at ECF No. 114-1. The primary argument he presents is that his hair has not caused any problems yet, and therefore he should be allowed to keep it long.

MOCC's grooming rules were written for MOCC, not for a prison housing pretrial detainees or female prisoners. It is West Virginia's most secure institution, housing prisoners who have been convicted of committing the most serious offenses, and who are serving the longest sentences. The prison staff must have the ability to enforce grooming rules as to all inmates, whether they are in general population or in administrative segregation.

With respect to the plaintiff's claim concerning hair length, the undersigned proposes that the presiding District Judge **FIND** as follows:

14

1.  The plaintiff's religion does not "require" a particular hair style, and certainly does not mandate long hair at the back of the head;

2.  The defendants have compelling governmental interests in the safety and security of MOCC and the identity and hygiene of inmates housed at MOCC;

3.  The grooming policy in place at MOCC, which provides that hair length will not exceed the top of the collar or ears, be no more than three inches on top, tapered and not blocked, neat and clean supports the compelling governmental interests of security, safety and health of inmates and staff;

4.  A less restrictive policy, such as permitting a few inmates who profess certain religious beliefs, to grow long hair, will undermine safety, security, discipline, and identification;

5.  Haircuts consistent with the grooming policy are the least restrictive means of enforcing the compelling interests advanced; for those in administrative segregation who steadfastly refuse to submit to a haircut and who have hair capable of concealing contraband, forced haircuts are the least restrictive means of enforcing the compelling interests advance, but they should be infrequent and undertaken only when necessary to insure safety, security and health of inmates and staff.

**Tobacco Use**

The plaintiff claims that his religion requires him to use

15

tobacco.   (ECF No. 89-1, at 3.)   He admits that he became an adherent of Taino when the Division of Corrections banned use of tobacco by inmates.   (ECF No. 2, at 16 ("I hoarded enough tobacco to last me several months and decided to declare to the Chaplain that I was Taino Native American to maintain weekly tobacco access for religious reasons").)

7.  Taino Spirituality is my religion, or Bonken (Puerto Rican)-Taino Spirituality, or Tainoism.  My religion requires the smoking and offering of tobacco to the Spirits.  Tobacco is a conduit, or a bridge which carries the prayers to the Creator and/or the Spirits and without it, the prayers do not leave this world.

8.  The defendants allowed me to order a large tobacco leaf <u>after</u> the DOC tobacco ban and I did use the tobacco in general population and in the segregation units and I created no problem whatsoever.  I used natural tobacco. MOCC had the time, space, and staff.  I did not break any tobacco rules.  This is undisputable evidence that the least restrictive means available was used to allow <u>me</u> to use tobacco, now the warden claims there is no least restrictive means available for tobacco use.  Yet in defendants' First Response to my discovery request, bottom of page 3, "Each Native American religion participant is now permitted to use the pipe mixture once a week instead of once a month. There is still the precaution of having additional correctional staff to help supervise the service." There are approximately 20 active participants, according to the defendants, "which has permitted more frequent use of the pipe mixture." I am one man.  Defendants raise claims of it being impossible to allow me to use tobacco, despite the fact that it was possible numerous times, claim there is no least restrictive way to allow me to use tobacco, but admit it is possible to allow a group of about 20 to use their pipe mixture more frequently, despite there still being worries of having additional staff.  Not only does this prove the least restrictive mean to allow me to use tobacco safely and efficiently as I've done numerous times in the past, but also have demonstrated the fact that they deny me a basic feature of my religion while granting the same feature to the adherents of another

religion, which is a violation of the Equal Protection Clause.

(ECF No. 89-1, at 3-4.)

Operational Procedure # 5.08 specifically addresses the use of tobacco.  If a Native American religion participant wishes to use a personal prayer pipe during a Native American prayer service, a blend of red willow bark (75%) and kinnikinnick/tobacco without tobacco leaves or twist tobacco (25%) is allowed, with strict control by prison staff over the pipe mixture.  (ECF No. 75-1, Ex. 2, at 20.)  The Operational Procedure states that "MOCC has a compelling governmental interest to control the introduction of contraband, to include tobacco products, into the inmate population."  Id.

The defendants argue that the plaintiff's claim with respect to tobacco use should be dismissed.  (ECF No. 76, at 7.)  They point out that he has failed to produce any evidence whatsoever, other than his self-serving statements, that 100% fresh leaf tobacco is essential to Taino religious celebrations.  Id.  The defendants cite to Farrow v. Stanley, 2004 WL 224602 (D.N.H., Feb. 5, 2004), a magistrate judge's report and recommendation.  In further proceedings in Farrow, a district judge held that use of kinniknick with traces of tobacco did not force the Native American plaintiff to violate his religious beliefs or to depart significantly from his religious traditions.  Farrow, 2005 WL 2671541 at *5 (D.N.H. Oct. 20, 2005).

17

The plaintiff's response argues that <u>Farrow</u> and other cases address Native American beliefs, not Taino spirituality. (ECF No. 90, at 10.) He points out that he has provided abundant evidence of the centrality of tobacco for Taino religion, particularly in his response to the defendants' motion to dismiss. (ECF No. 33, Attachment 8.) He asserts that he has "never broken any rules related to tobacco." (ECF No. 90, at 12.) The plaintiff scoffs at the defendants' reliance on tobacco's carcinogenic properties in their denials of his grievances relating to tobacco use. <u>Id.</u>

In <u>Bailey v. Rubenstein</u>, No. 2:08-cv-01204, 2009 WL 1024614 (S.D. W. Va. Apr. 15, 2009), Chief Judge Goodwin considered a MOCC inmate's challenge to Operational Procedure # 5.08 and its restrictions on Native American religious practices, particularly smoking tobacco.[6] He found that

> the prison regulations restricting tobacco use are reasonably related to a legitimate penological interest. That interest is the prevention of inmates acquiring tobacco, which is contraband, outside of religious ceremonies. * * * Because the WVDOC ban on tobacco and the MOCC regulations concerning Native American religious practices are reasonably related to the penological interest, and because the regulation preserves Mr. Bailey's opportunities to practice his Native American religion, Mr. Bailey has not established likely success of his claims on the merits.

The inmate's motion for injunctive relief was denied.

---

[6] The Memorandum Opinion and Order incorrectly attributes the Proposed Findings and Recommendation to the undersigned; the document was written by U.S. Magistrate Judge R. Clarke VanDervort.

In <u>Lovelace v. Lee</u>, 472 F.3d 174, 187 (4th Cir. 2006), the Fourth Circuit defined "substantial burden" for the purpose of RLUIPA analysis as one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."  The plaintiff has submitted evidence that the use of tobacco is a significant part of Taino spirituality.[7]  MOCC's Operational Procedure permits the plaintiff to smoke a tobacco mixture in a prayer service.  Thus the defendants are neither violating the plaintiff's beliefs nor requiring him to modify his behavior, in light of the compelling interests to restrict the introduction of contraband into the prison and to limit the use of tobacco due to health risks.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to show that Operational Procedure # 5.08 imposes a substantial burden on his religious exercise with respect to the use of tobacco.

**Music**

The plaintiff asserts that his

religion requires that I listen to the music of my people, which are [sic] rich in history.  It is a way to honor and remember my ancestors and this has been a long tradition of the Taino people and Puerto Ricans, who are now the dominant culture.

---

[7] Internet research indicates that Taino Arawak natives were using tobacco when Christopher Columbus arrived, but the connection between tobacco use and religious practice is not clear.

(ECF No. 89-1, at 5.)

The defendants argue that the plaintiff "has presented no evidence that a pre-Columbian religion requires its adherents to listen to a particular genre of music." (ECF No. 76, at 8.) They point out that, as an accommodation to his purported religious beliefs, the plaintiff is permitted to listen to music for a limited period of time, despite Operational Procedure # 3.30, which does not allow the use of stereos in the administrative segregation unit. Id.; ECF No. 75-1, Ex. 4, Aff. of Warden Ballard, ¶ 14, at 27; Ex. 5.

The plaintiff responds that "[o]ne of the primary religious practices of the Taino people is music, singing, and dancing." (ECF No. 90, at 23.) He points to his response to the defendants' motion to dismiss for evidentiary support of his claim that his belief system includes music and dancing. (ECF No. 33, Attachment 4.) The undersigned assumes that music and dancing are a part of the plaintiff's religious observances.

Other than his self-serving declarations, the plaintiff has offered no evidence of any kind that limitations on the amount of time he listens to music impose a substantial burden on his exercise of his religious beliefs. There is absolutely no limit on the number of hours during which the plaintiff can generate his own music by singing.

The undersigned proposes that the presiding District Judge

**FIND** that the defendants have not imposed a substantial burden on the plaintiff's exercise of his religious beliefs with respect to music.

### Correspondence with Certain Groups

The plaintiff alleges that he is not being allowed to receive mailings or visits from other adherents of the Taino-Arawak religion. (ECF No. 2, at 27-28, 33.)

The defendants note that inmates in segregation have the same access to mail as the inmates in general population. (ECF No. 76, at 8.) A special mail log has been created due to the plaintiff's incessant complaints that he does not receive responses to his correspondence. Id. Warden Ballard's affidavit states that "the WVDOC and officials at MOCC have never forbidden Mr. Delgado access to spiritual reading materials or correspondence with Taino-Ar[a]wak organizations or religious groups." ECF No. 75-1, Ex. 4, ¶ 17, at 27-28. Moreover, Warden Ballard indicates that the plaintiff's mail is being logged to assure his receipt of it, and that prison officials would permit a Taino-Arawak religious event to be presented by a volunteer organization. Id. ¶¶ 18-20, at 28. The Court notes that Operational Procedure # 5.08 specifically provides that the Religious Services Department will "attempt to help inmates contact representatives of their faith and/or obtain literature." ECF No. 75-1, at 12.

The plaintiff responds that he can recite specific instances

21

of his failure to receive mail which others claim to have sent to him.  (ECF No. 90, at 28.)  He believes that the lack of responses to his letters is more than a coincidence and that prison officials are purposefully restricting his receipt of mail.  Id. at 29-31.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to prove by any evidence other than his own conclusory allegations that his religious exercise is being burdened by prison officials with respect to his receipt of mail or visitors.

It is respectfully **RECOMMENDED** that the defendants' motion for summary judgment be granted as to the plaintiff's RLUIPA claims.

Equal Protection (Declaratory and Injunctive Relief)

The plaintiff claims that MOCC prison officials favor Christianity and that he is being denied equal protection of the law.  (ECF NO. 2, at 70-71.)  He alleges that the defendants discriminate against him because of his race, heritage, language, culture and spiritual beliefs.  Id. at 12.  The areas he identifies as being disparate are feasts on holidays, and availability of religious movies, sermons and spiritual advisors.  Id. at 70-71. The Order entered September 28, 2010, ECF No. 44, limits this claim to whether the defendants in their official capacities and Operational Procedure # 5.08 violate the plaintiff's right to equal protection of the law.

Operational Procedure # 5.08 includes the following provision:

> The opportunity to participate in religious programs
> will not be denied to any inmate on the basis of race,
> color, creed, religious preference, or national origin.
> Nor shall any MOCC employee (to include contracted
> services employees or other non-WVDOC agency represented
> at this facility) proselytize or criticize the religious
> beliefs of others within the confines of this facility.
> Nothing in this provision shall prohibit the sharing of
> information regarding religious belief.

(ECF No. 75-1, at 12.)  The plain language of the quoted provision establishes that the policy of MOCC is egalitarian.  The Operational Procedure includes an attachment of "Warden Approved Religious Practice" relating to Native American Religious Practices.  (ECF NO. 75-1, at 18-21.)

It is well-settled that in order to establish an equal protection claim, a plaintiff must make a threshold showing "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  Veney v. Wyche, 293 F.3d 726, 730-31 (4th Cir. 2002) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)).  "Once this threshold showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  Morrison, 239 F.3d at 654.  Inmates do not constitute a suspect class; thus they are not entitled to strict scrutiny.  Roller v. Gunn, 107 F.3d 227 (4th Cir. 1997).  "Conclusory allegations of discrimination . . . not supported by reference to particular acts, practices, or policies" are insufficient to state a claim of

discrimination under § 1983.  United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979).

The defendants assert that the plaintiff is not treated differently because of his race, heritage, language, culture or spiritual beliefs.  (ECF No. 76, at 10.)  They point out that the tobacco ban is applied to all inmates (except for the limited use by Native Americans), and as an inmate in segregation, the plaintiff is limited in his access to music.  Id.  The defendants contend that the plaintiff has provided no evidence of any interference by prison officials with Taino reading materials or visitors.  Id.

The plaintiff's response is a verbose rant about his inability to possess contraband, the lack of Spanish language television on cable, the abundance of Christian programming on cable, a 2006 grievance, a Mexican inmate in 2007, his childhood, accusations that the defendants re racists, and so on.  (ECF No. 90, at 33-49.)

The plaintiff has failed to present any evidence that the defendants have intentionally or purposefully discriminated against him because of his race, heritage, language, culture and spiritual beliefs.  If anything, it appears that the plaintiff may have received special privileges which other segregation inmates do not receive, because of his relentless complaining.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to prove by any evidence other

than his own conclusory allegations that he has been denied his right to equal protection of the law. It is respectfully **RECOMMENDED** that the defendants' motion for summary judgment be granted as to the plaintiff's equal protection claim and that the plaintiff's request for declaratory and injunctive relief be denied.

Equal Protection (Money Damages)

For the reasons set forth in the preceding section, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to prove by any evidence other than his own conclusory allegations that he has been denied his right to equal protection of the law. It is respectfully **RECOMMENDED** that the defendants' motion for summary judgment be granted as to the plaintiff's equal protection claim and that the plaintiff's request for money damages be denied.

Retaliation for Exercise of First Amendment Right to Petition

The presiding District Judge has interpreted the plaintiff's claim to be that he alleges the defendants, acting in their official capacities, retaliated against him as a result of his exercise of his First Amendment right to petition for redress of grievances. (ECF No. 42, at 3.) The presiding District Judge has applied qualified immunity. Id. at 7. Thus the plaintiff's claim is for declaratory and injunctive relief only.

The plaintiff's complaint alleges that

17.   Defendants Ballard, McCloud and Sotak violated plaintiff's 1st Amendment right to petition the government for redress of grievances by retaliating against plaintiff for filing multiple grievances (in an attempt to protect his religious rights), by seizing and destroying plaintiff's mail, magazines and filing exaggerated and discriminatory disciplinary charges against plaintiff to punish in an attempt to silence.

(ECF No. 2, at 12.)

In the Statement of Facts section of his complaint, the plaintiff alleges that he filed various grievances, and recites the result.

| Date of Grievance/ ¶ in complaint | Subject of Grievance | Response |
|---|---|---|
| 8/7/08, ¶ 42 | Denial of daily use of natural tobacco for prayer and smudging ceremonies | Permitted to use tobacco once a month under supervision per Op. Proc. # 5.08 |
| 8/8/08, ¶ 43 | Request for daily fresh leaf tobacco | Permitted to use tobacco once a month under supervision per Op. Proc. # 5.08 |
| 8/28/08, ¶ 45 | Denial of tobacco for prayer | Denied without comment |
| 8/28/08, ¶ 46 | Request for religious exemption for hair length | Explanation as to security, safety and health issues provided |
| 9/8/08, ¶ 47 | Denial of his right to correspond with Taino-Arawak legal counsel and religious leaders (the plaintiff has not received responses to his letters) | Denied |
| 9/17/09, ¶ 49 | Complaint about Cpl. | Allegations will be |

26

|  | Joshua Taylor | investigated |
|---|---|---|
| 9/18/08, ¶ 51 | Request that Clarence Rider assist in contacting a Taino religious leader | Denied |
| 10/6/08, ¶ 54 | Request to possess stereo and Puerto Rican salsa music in exchange for surrendering tobacco privileges | Allowed to have stereo and 3 CDs for 1 hour per week |
| 10/?/08, ¶ 57 | Failure to receive issue of King magazine | Denied |
| 11/24/08, ¶ 58 | Denial of correspondence from Puerto Rico Demographic Registry (no response received) | Denied that any correspondence was refused |
| 11/24/08, ¶ 59 | Denial of correspondence from Puerto Rican/Latino/Taino organizations to which plaintiff wrote (no response received) | Denied that any correspondence was refused |
| 12/1/08, ¶ 60 | Request for reconsideration of limit of 1 hour per week of music | Denied |
| 12/3/08, ¶ 63 | Request to continue using natural tobacco and not red willow bark mixture | Denied |
| 12/16/08, ¶ 65 | Request to continue using natural tobacco and not red willow bark mixture | Denied |
| 1/8/09, ¶ 70 | Failure to receive | Instructed to |

| | | |
|---|---|---|
| | Dec. '08 issue of Prison Legal News magazine | contact the subscription department |
| 2/9/09, ¶ 72 | Failure to receive Jan. '09 issue of Prison Legal News magazine | Magazine did not arrive; MOCC mailroom instructed to look for magazine |
| 2/17/09, ¶ 75 | Request for names and addresses of other jurisdictions using red willow bark mix | Denied |
| 2/17/09, ¶ 76 | Request for chemical composition, etc. of red willow bark mix | Denied |
| 2/17/09, ¶ 77 | Request for names and addresses of trial leaders re red willow bark mix | Denied |
| 2/17/09, ¶ 78 | Request for permit allowing Warden to "prescribe" red willow bark mix | Denied |
| 2/18/09, ¶ 79 | Complaint that Lt. McCloud gave retarded and false responses to the four 2/17/09 grievances | Advised that answers are provided in 3 memos from Warden Ballard |
| 2/18/09, ¶ 88 | Requirement that the plaintiff must purchase red willow bark to mix with his tobacco | Instructed to complete Inmate Religious Accommodation Request form; denied |
| 2/18/09, ¶ 93 | Request for more than one hour of music per week | Denied |
| 2/24/09, ¶ 80 | Request for answers to questions; complained about "racist | Denied |

| | administration" | |
|---|---|---|
| 2/24/09, ¶ 81 | Failure to receive Feb. '09 issue of Prison Legal News magazine | Denied; MOCC mailroom instructed to log all mail addressed to Delgado (magazine was received 3/2/09) |
| 3/5/09, ¶ 82 | Request to use stereo and music all day on Mar. 22 & 23 to worship on my birthday, and on June 7 (Puerto Rican Day) | Denied |
| 3/9/09, ¶ 82 | Accusation that Lt. McCloud is an ignorant racist who provides retarded responses to grievances; description of prison administration as "ignorant" and "racist" | Served with notice of violation of rule 2.32, insubordination and insolence; 3/17/09, convicted; appeal denied |
| 3/10/09, ¶ 87 | Request for hair grease because longer hair was wooly, dry and brittle.  Due to denial of the grievance, the plaintiff cut his hair | Denied (lotion, vaseline, hair grease not permitted in segregation unit) |
| 3/11/09, ¶ 99 | Request to use stereo and music all day on Mar. 22 & 23 to worship on my birthday, and on June 7 (Puerto Rican Day) | Denied |
| 8/21/09, ¶ 112 | Seizure of Spanish book ("Memoria | ? |

| | Indigena") | |
|---|---|---|
| 9/28/09, ¶ 113 | Lack of books and videos on Tainos | Advised to request donations of books and videos (the same as other faiths) |
| 10/1/09, ¶ 114 | Complaint of discrimination against Hispanics; request for observation of Hispanic Heritage Month | Denied |

After careful review of the plaintiff's numerous and frequently abusive and insulting grievances, it is clear that his claims of retaliation are meritless. The plaintiff was "punished" with respect to a grievance only once, and that was for conduct which was indeed insubordinate and insolent. The plaintiff's unsubstantiated accusations that prison staff is interfering with his receipt of mail are based exclusively on the fact that he has not received responses to his correspondence. It is entirely possible that the reason he has not received responses is because he is a prison inmate, serving life without possibility of parole upon his conviction for a heinous crime.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to prove by any evidence other than his own conclusory allegations that he has been retaliated against for exercising his First Amendment right to petition for redress of grievances. It is respectfully **RECOMMENDED** that the defendants' motion for summary judgment be granted as to the

plaintiff's retaliation claim and that the plaintiff's request for declaratory and injunctive relief be denied.

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to Judge Copenhaver.

The Clerk is directed to file this "Proposed Findings and Recommendation," to mail a copy of the same to the plaintiff, and to transmit it to counsel of record.

October 6, 2011
      Date

*Mary E. Stanley*
Mary E. Stanley
United States Magistrate Judge

32