UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

MIGUEL ANGEL DELGADO,

                    Plaintiff,

v.                                        Civil Action No. 2:09-1252

DAVID BALLARD,
CLARENCE J. RIDER,
JAMES McCLOUD, and
CHARLENE SOTAK,

                    Defendants.


MEMORANDUM OPINION AND ORDER


        Pending are plaintiff's "urgent motion for temporary
restraining order," ("TRO motion") filed July 26, 2011, and
defendants' motion for summary judgment, filed March 3, 2011.


I.


        This action was previously referred to Mary E.
Stanley, United States Magistrate Judge, who has submitted two
separate Proposed Findings and Recommendations ("PF&R") pursuant
to the provisions of 28 U.S.C. § 636(b)(1)(B).  On August 24,
2011, the first PF&R was filed.  It was directed solely toward
the TRO motion.  On August 31, 2011, plaintiff filed his
objections to the first PF&R (first set of objections), which

disclosed, as more fully discussed _infra_, the mooting of the controversy giving rise to the TRO motion.

On October 6, 2011, the second PF&R was filed addressing defendants' motion for summary judgment.  On October 19, 2011, the court extended plaintiff's time to object to the second PF&R to December 5, 2011.  On November 23, 2011, plaintiff filed his objections to the second PF&R (second set of objections).  On December 5, 2011, defendants' filed their response to the second set of objections.

## II. The First PF&R

The magistrate judge adequately sets forth the factual circumstances surrounding plaintiff's TRO motion.  In sum, plaintiff alleges he suffered an imminent threat that his hair would be cut by Mount Olive Correctional Complex ("MOCC") employees.  Defendants responded that no such threat existed and that plaintiff faced only disciplinary action for the refusal to allow his hair to be cut, such as the withdrawal of certain privileges.  Defendants additionally offered a number of

justifications supporting the reasonable hair length requirement enforced at MOCC.

The first set of objections filed August 31, 2011, note that plaintiff cut his hair voluntarily "[b]efore the Christian employees of MOCC could try to beat me senseless." (Objecs. at 6).  Inasmuch as the threat about which plaintiff complains is now nonexistent, and that the withdrawal of unspecified privileges does not constitute an imminent harm requiring resort to extraordinary relief, the court concludes that plaintiff is unable to "'clear[ly] show[]'" that he is likely to succeed on the merits respecting the claim.  <u>See Dewhurst v. Century Aluminum Co.</u>, 649 F.3d 287, 290 (4th Cir. 2011) (quoting <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 23 (2008)).

Following a <u>de novo</u> review, and having concluded that the first set of objections lack merit, it is ORDERED that the first PF&R be, and it hereby is, adopted and incorporated herein.

### III.   The Second PF&R

The second PF&R addresses defendants' motion for summary judgment.  It recommends dismissal of this action. Plaintiff's principal complaint in this case is that defendants are unfairly victimizing him as a result of his religious beliefs and practices.  He alleges adherence to a Taino/Arawak belief system.[1]  He asserts (1) a claim under the Religious Land Use and Institutionalized Persons Act, Pub. L. No. 106–274, 114 Stat. 803 ("RLUIPA"), (2) a claim under the Equal Protection Clause of the Fourteenth Amendment, and (3) a First Amendment retaliation claim.

### A.   The RLUIPA Claim

#### 1.  Hair Length

The magistrate judge first addresses the MOCC hair length restrictions applicable to plaintiff and his fellow

---

[1] It appears that the Taino Arawak were a Native American group "who traded with other civilizations in South and Central America." Cultures of the World -- Puerto Rico 19 (2006).  The Taino Arawak encountered Columbus during his second voyage to the Caribbean. Id. They also assisted Juan Ponce de Leon in establishing the first Spanish settlement there. Id.

4

inmates.  Plaintiff contends that he must be permitted to grow his hair beyond the restricted length.

In Smith v. Ozmint, 578 F.3d 246 (4th Cir. 2009), the court of appeals addressed an inmate's challenge to a correctional policy requiring short haircuts and authorizing correctional employees to forcibly groom noncompliant inmates. The inmate in Smith was forcibly shorn on two occasions, both of which involved physical violence.  The decision in Smith recites the standards governing RLUIPA claims as follows:

> "If a plaintiff produces prima facie evidence" of an RLUIPA violation, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the [policy] or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." Id. § 2000cc-2(b). In particular, the government must prove that the burden in question is the least restrictive means of furthering a compelling governmental interest. Id. § 2000cc-1(a). As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the government. Gooden v. Howard County, Md., 954 F.2d 960, 971 (4th Cir.1992) ("[W]here ... the movant would have the burden of persuasion at trial, the summary judgment burden is a correspondingly heavy one.").

Smith, 578 F.3d at 250.  The court of appeals first agreed with the inmate respecting the substantial burden requirement:

"The policy requiring Smith to cut his hair -- and
implementing that policy with physical force --
compelled him to modify his behavior in violation of
his genuinely held religious beliefs. Accordingly, we
conclude that the MSU grooming policy substantially
burdened Smith's religious exercise."

Id. at 251.  At the same time, the court of appeals observed

that "due deference must be given 'to the experience and

expertise of prison and jail administrators in establishing

necessary regulations and procedures to maintain good order,

security and discipline, consistent with consideration of costs

and limited resources.'" Id. at 252 (quoting Cutter v.

Wilkinson, 544 U.S. 709, 723 (2005) (noting as well that

"Security concerns deserve 'particular sensitivity.'").

        The court of appeals ultimately concluded that the

defendants had not demonstrated, as required by RLUIPA, the use

of the least restrictive means to achieve a compelling

governmental interest.  The basis for that conclusion was that

(1) defendants' proffered reason for its policy was a

"conclusory, one-sentence explanation," and (2) where they

offered more particularized explanations for the policy, they

involved an entirely different category of inmates.

Forced grooming has not been visited upon plaintiff. There is no apparent likelihood that it will. Further, unlike the defendants' justifications in <u>Smith</u>, Warden Ballard's reasons supporting the policy, summarized below, are well-explained and particularized:

Close, hands-on, physical interaction occurs during inmate searches, which are brought to a more speedy and effective end when inmates have short hair. These manpower concerns are more particularized than those relied upon in <u>Smith</u>. For example, Warden Ballard specifically alleges that "WVDOC is already running a significant deficit." (Doc. 109-1 at 5).

Contraband is harder to hide in short hair.

Long hair makes it more difficult and unsanitary for correctional officers to complete their work inasmuch as inmates are known to use feces, blood, urine, and semen to inhibit correctional staff interactions with them, sometimes applying the substances to their persons, and perhaps more willing to apply it to their hair if it is long.

Inmates have used long hair for the purpose of assaulting staff assigned to search the hair, noting "[i]t is well known in the corrections profession that inmates have placed sharp objects, such as needles, hooks, razors, pins, staples, and any other small sharp objects, as well as other "traps" in their hair for the purpose of injuring the staff member assigned to search the long hair." (Doc. 109-1 at 3).

Long hair increases the health risk caused by communicable parasites such as lice and scabies. Long hair impairs staff ability to detect and treat these conditions, which might cause an infestation in the prison setting. (Doc. 109-1 at 4 (noting as well that "parasitic infestations were, under the previous policy, difficult to prevent and control.")).

Inmates have been able to manufacture or procure devices such as keys that are easily concealed in long hair and capable of opening their restraints.

An inmate with long hair tends to be more vulnerable to other inmates as it provides a means for grabbing and holding the inmate for assault purposes.

In the event of an escape, an inmate could shave his hair, thereby dramatically altering his appearance, and evading detection and recapture. The measure thus deters escape attempts.[2]

Based upon these sworn reasons, the magistrate judge recommends findings that (1) plaintiff's religion does not "require" a particular hair style or length, and (2) defendants' grooming policy represents the least restrictive means of accomplishing the compelling governmental interests in safety, security, discipline, and identification.

---

[2] Warden Ballard's affidavit of reasons is not perfect. For example, plaintiff asserts that women inmates may grow their hair without a hair length limiter.  The same point was observed in Smith.  Smith, 578 F.3d at 254 (noting defendants' failure to "explain why the SCDC is able to deal with hygiene and security concerns with respect to female inmates who must keep their hair "at least one (1) inch long.").  Aside from the fact that there may be differing safety and security considerations applicable in the male and female correctional settings, the question is not whether Warden Ballard has chosen the best or perfect policy to address a legitimate penological problem.  It is whether he has chosen the least restrictive means of doing so while furthering a compelling governmental interest.  See Smith, 578 F.3d at 250.

Plaintiff objects.  He first asserts that while the restrictions limit the length that he can grow his hair, there are no corresponding limits on beard length, which indicates disparate treatment of those with a different belief system. The assertion is not entirely accurate.  Operational Procedure 3.47 governing the relevant grooming requirement provides that "[f]acial hair of any kind is not permitted, unless the Physician/Physician Assistant (PA) finds that there is a verifiable medical reason for the inmate not to shave on a daily/regular basis." (Ex. 1 at 2, Aff. of Warden  Ballard).  At a later point in the Operational Procedure one finds an exception for "[r]eligious issues regarding facial hair [that] will be addressed on a case by case basis through the MOCC Religious Advisory Committee."  (Id. at 3).

Relying upon this carve out, plaintiff asserts it is discriminatory to allow facial hair exemptions without permitting the chance for other types of hair length allowances. Plaintiff does not state, however, whether any religious-based exemption has ever been granted for those desiring beards. Additionally, the court does not understand plaintiff to allege that MOCC officials would not at least consider religious-based hair length exceptions even if the possibility is not explicitly

mentioned in Operational Procedure.  These considerations, taken with those offered by the magistrate judge relating to the proceedings on remand in <u>Smith</u>, are fatal to this portion of plaintiff's RLUIPA claim.  (<u>See</u> PF&R at 11-13).[3]

Having considered the entirety of the record in the light most favorable to plaintiff, the court concludes that no rational trier of fact could find in plaintiff's favor respecting the hair-length component of his RLUIPA claim. <u>See</u> <u>Smith,</u> 578 F.3d at 252 ("[S]ummary judgment is only appropriate if a rational factfinder would necessarily find that the grooming policy withstands scrutiny under RLUIPA.").  Defendants have established as a matter of law that the MOCC grooming policies relating to hair length are the least restrictive means of furthering multiple compelling governmental interests.

---

[3] In attempting to demonstrate hair-length discrimination in another way, plaintiff asserts that a hair length exemption was previously granted to a fellow inmate based upon his Native American heritage.  Inasmuch as the exemption occurred fifteen years ago, in 1997, it is too remote in time to raise a genuine issue of material fact on this portion of the RLUIPA claim.

2.  Tobacco


        The next portion of the RLUIPA claim involves MOCC
restrictions on tobacco use.  Defendants' policy is summarized
in the memorandum supporting their dispositive motion:

> Tobacco use at MOCC was barred in 2008. Since that
> time, MOCC has allowed Native Americans to gather to
> smoke a mixture of tobacco and tobacco substitutes as
> part of various prayer groups. Native Americans, no
> matter their tribe or region of origin, are allowed to
> meet to perform smoking rituals on a regular basis
> pursuant to Operational Procedure 5.08. During the
> time described in Mr. Delgado's Complaint, two
> versions of the policy have been in effect. The first,
> which went into effect on 1 February 2008, is attached
> as Exhibit One. The second, which went into effect on
> 1 July 2009, is attached as Exhibit Two. Both policies
> bar the use of more than 25% tobacco in smoking
> rituals.

(Defs.' Memo. in Supp. at 3).  The referenced "mixture"
consisted of 75% Red Willow Bark and 25% tobacco.  The summary
above, however, appears incomplete.  Plaintiff has tendered a
January 8, 2010, memorandum from Warden Ballard that eliminates
the mixture, requiring instead the use of 100% Red Willow Bark
for religious observances.  (<u>See</u> Doc. 90-2 at 57).

11

The rationale supporting the partial tobacco ban in effect prior to the January 8, 2010, policy change is found in the July 1, 2009, version of Operational Procedure 5.08:

> MOCC has a compelling governmental interest to control the introduction of contraband, to include tobacco products, into the inmate population. Further, MOCC must consider the costs associated with the use of Staff/Officers, space availability, and time factors in the administration of any program, religious or otherwise. With the documented cases of tobacco from the tobacco stored in the Chapel and used in the Native American prayer ceremonies being found in the possession of inmates on the yard, and the case of tobacco orders missing, this procedure is the least restrictive alternative available instead of banning the use of tobacco all-together.

(Doc. 75-1 at 20).  The court has also reviewed a separate affidavit filed by Warden Ballard respecting the tobacco policy:

> The WVDOC implemented an across-the-board bar against inmate use of tobacco products in order to ensure the health and safety of the inmate population.
>
> Smoking in any amount and for any reason has been shown unequivocally to cause cancer and various other ailments, regardless whether an individual smokes tobacco or is near someone smoking tobacco.
>
> There is not a less restrictive means of addressing these health concerns with respect to tobacco use.

(Doc. 75-1 at 27).  These excerpts illustrate that defendants' tobacco policy is rooted in compelling efforts to (1) chip away at a serious prison contraband problem, and (2) reduce the

health costs and other problems associated with prison tobacco use that loom on the horizon.  <u>See</u> <u>Food & Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 125 (2000) ("This case involves one of the most troubling public health problems facing our Nation today: the thousands of premature deaths that occur each year because of tobacco use.").

Without reaching the question of whether the tobacco restriction imposes a substantial burden on his religious exercise with respect to tobacco use, it appears that defendants have shown the tobacco ban serves compelling governmental interests using the least restrictive means available. Plaintiff emphasizes the mixture option is no longer available. The irony of that development, however, actually underscores the fact that the least restrictive means, namely, an outright ban, has been chosen.  After attempting to allow tobacco use for religious observances via the tobacco/Red Willow Bark mixture, Warden Ballard's January 8, 2010, memorandum noted that the modification was prompted by the fact that "the [contraband] introduction of tobacco continues to be an ongoing problem." (Doc. 90-2 at 57).  The tobacco/Red Willow Bark mixture discussed by the magistrate judge apparently did not solve the

illicit tobacco trade at MOCC.  Stronger, and more restrictive, measures thus became necessary.

Having considered the entirety of the record in the light most favorable to plaintiff, the court concludes that no rational trier of fact could find in plaintiff's favor respecting the tobacco component of his RLUIPA claim. Defendants have, as a matter of law, satisfied their burden to establish that the MOCC tobacco ban is the least restrictive means for furthering multiple compelling governmental interests.

## 3. Music

Plaintiff next challenges the restrictions placed upon his use of music during his religious observances.  It is important to note that plaintiff is not altogether prohibited from using music.  Indeed, Warden Ballard avers that MOCC officials have made an exception to their usual rules respecting those in administrative segregation and allowed plaintiff to listen to music for an unstated but limited period of time.[4]  The

---

[4] Plaintiff states he is given a radio and three of his compact discs to use.  He initially stated he was provided insufficient time with the device and discs.  As a result, he admits that he  "would take the radio for one hour and just listen to the local radio stations, or

magistrate judge concluded, <u>inter alia</u>, that "plaintiff has

offered no evidence of any kind that limitations on the amount

of time he listens to music impose a substantial burden on his

exercise of his religious beliefs."  (PF&R at 20).  She observes

that plaintiff can make music by singing.  One of the cultural

sources relied upon by plaintiff actually mentions singing as a

part of certain religious observances. (Doc. 90-4 at 11).

    Plaintiff objects, emphasizing the importance of music

to his religious observance.  The court, like the magistrate

---

. . . just let the radio sit on the floor until 59
minutes later when the guards would come pick it up."
(Objecs. at 19).  The correctional officers, however,
began leaving the radio for longer periods of time in the
hopes of accommodating him, and eventually discontinued
the practice of removing it from his cell.  In August
2011, however, they reverted to the former practice and
removed the stereo after plaintiff refused to comply with
the grooming policy.  Plaintiff challenged that action
before the magistrate judge, who denied him relief, and
appears to have lodged an appeal on October 12, 2011.
Inasmuch as the magistrate judge's ruling on the point,
which required resort to the inmate grievance process in
the first instance, is neither clearly erroneous nor
contrary to law, it is ORDERED that the appeal be, and it
hereby is, dismissed.
    Plaintiff also complains that inmates of the
Christian faith have access to Christian television
programs on a 24-hour basis.  He notes as well that other
inmates have access to radios in their cells.  He does
not specify the television or radio privileges available
to those inmates, like him, who reside in administrative
segregation.  He also does not disclose the extent to
which these privileges depend upon obedience to MOCC
policies.

judge, credits his views on the point.  The question is not whether defendants' regulations burden his religious exercise, however, but rather whether they result in a substantial burden thereon as contemplated by RLUIPA.  A substantial burden is "one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of her religion and forfeiting [governmental] benefits on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." <u>Lovelace v. Lee</u>, 472 F.3d 174, 187 (4th Cir. 2006) (internal quotation marks and citations omitted).

        Having considered the entirety of the record in the light most favorable to plaintiff, the court concludes that no rational trier of fact could find in plaintiff's favor respecting the music component of his RLUIPA claim.  Inasmuch as plaintiff has limited access to a stereo, and that he may generate his own music through song, he has not demonstrated the required substantial burden.

16

### 4. Correspondence

Plaintiff next asserts that MOCC officials are illegally intercepting and interfering with his mail. The assertion serves as a predicate for both his RLUIPA allegations and his First Amendment retaliation claim.

As to that portion of the RLUIPA claim to which the allegations relate, the magistrate judge recommended dismissal inasmuch as (1) MOCC has created a special mail log to assure plaintiff receives his mail, and (2) MOCC has offered to assist inmates in contacting adherents of their faiths and obtaining literature. Plaintiff objects, essentially asserting he has requested the log and never received it. He also asserts that his requests for assistance in contacting those of his same faith have been denied.

It is helpful to trace development of the mail interception allegations following their appearance in the complaint. In its September 24, 2010, memorandum opinion and order addressing defendants' motion to dismiss, the court assumed plaintiff had stated a claim for First Amendment retaliation based upon his allegations of mail interception and

interference.  Later in the litigation, plaintiff further complained of mail interception and interference.  On one occasion, he complained that MOCC staff took a letter addressed to him from the Kanawha County Public Library and provided it to an investigator at MOCC.  A correctional officer advised plaintiff that the investigation surrounding the letter had "something to do with a Social Security number."  (Doc. 65 at 1).  No other details are provided.

He also points to a letter he attempted to send to William Boxall on September 9, 2008.  While he asserts the letter never left the facility, he claims it was returned to him three months later marked "Return to Sender."  In an email to a MOCC official, from an individual purporting to be Mr. Boxall, writing under the email address wildwillysweed@rogers.com, it is stated that Mr. Boxall never received an expected return letter from defendant in 2008 and that he had experienced problems with mail sent to "the West Virginia prison system . . . ."  (Doc. 90-5 at 2).  Defendants assert the letter to Mr. Boxall was never sent inasmuch as plaintiff failed to provide a voucher to pay for mailing costs and that the delay in returning it to him was an oversight. Plaintiff disputes the point.

The record, however, contains other evidence submitted
by plaintiff on the point.  First, in his 71-page complaint, he
notes that he has "written numerous Taino groups and . . . never
receive[d] any mail from any of them nor have" his letters been
returned."  (Compl. at 27; see also Pl.'s Resp. to Mot. to Dism.
at 7 ("Countless letters to different destination[s] with no
response?")).  It may be the case that none of the addressees
wish to correspond with plaintiff.  It might also be a case of
innocent misdirection by MOCC mailroom staff.

Next, plaintiff references the confiscation of what
appears to be a pornographic magazine which was kept from him
based upon the fact that it included bondage scenes.  The scenes
were apparently deemed in violation of MOCC policy.  Despite the
violation, the magazine was later provided to plaintiff.

Third, his affidavit submitted in response to
defendants' dispositive motion asserts only that "Defendants
also made my mail disappear.  Either my outgoing mail is being
discarded, or my incoming mail is made to disappear, including
numerous magazines."  (Doc. 89-1 at 7).[5]  That sworn allegation

_____

[5] Plaintiff attempts in his affidavit to incorporate by
reference the immense number of pages previously filed in
the case and "declare [they are] submitted under penalty
of perjury . . . ."  (Aff. of Miguel Delgado at 9).  The

19

is conclusory.  The unsworn memorandum of law supporting his response contains an indication that his mail privileges are intact.  One finds references therein to plaintiff both sending and receiving mail successfully.  (<u>See</u> 90-1 at 54).  He mentions receiving a letter from Charles Houdyschell, Senior Assistant Attorney General of West Virginia, dated August 25, 2010.  He then notes his response letter to Mr. Houdyschell.

Fourth, one need only review the docket in this case to see the free flow of correspondence between plaintiff and the court.  The record contains dozens of letters and filings from plaintiff to the Clerk and the court.  The court is likewise unaware of any allegation that materials sent to him from the court were misdirected or intercepted.  One would reasonably expect any nefarious interception scheme to place a premium on occasionally interfering with mail going to and coming from the court inasmuch as it might negatively impact plaintiff's efforts to prosecute the litigation.

At the summary judgment stage, plaintiff is obliged to demonstrate that a genuine issue of material fact remains respecting his allegations of mail interception.  Assuming the

---

court does not deem that approach authorized by Federal Rule of Civil Procedure 56.

record is sufficient to demonstrate defendants have intercepted
or interfered with his mail, plaintiff must, for purposes of his
RLUIPA claim, offer proof raising a reasonable inference that
defendants have done so in order to impose a substantial burden
upon the exercise of his religious beliefs.  He has failed in
that regard.  Having considered the entirety of the record in
the light most favorable to plaintiff, the court concludes that
no rational trier of fact could find in plaintiff's favor
respecting the correspondence component of his RLUIPA claim.

        Inasmuch as plaintiff has failed to create a triable
issue respecting any portion of his RLUIPA claim, it is ORDERED
that defendants' motion for summary judgment as to the RLUIPA
claim be, and it hereby is, granted.


B.    Equal Protection


        As noted by the magistrate judge, plaintiff asserts a
claim under the Equal Protection Clause of the Fourteenth
Amendment based upon his assertion that defendants favor those
who subscribe to the Christian faith over those who have
Taino/Arawak beliefs.  The equal protection claim requires
plaintiff to "'first demonstrate that he has been treated

differently from others with whom he is similarly situated and
that the unequal treatment was the result of intentional or
purposeful discrimination.'" **Veney v. Wyche**, 293 F.3d 726, 730-
31 (4th Cir. 2002) (quoting **Morrison v. Garraghty**, 239 F.3d 648,
654 (4th Cir. 2001)). If plaintiff makes this showing, "'the
court proceeds to determine whether the disparity in treatment
can be justified under the requisite level of scrutiny.'" **Id.**
Respecting application of the second prong of the test, the
court of appeals in **Veney** observed as follows:

> When equal protection challenges arise in a prison
> context, . . . courts must adjust the level of
> scrutiny to ensure that prison officials are afforded
> the necessary discretion to operate their facilities
> in a safe and secure manner. In a prison context,
> therefore, we must determine whether the disparate
> treatment is "reasonably related to [any] legitimate
> penological interests." . . . Accordingly, to state a
> claim upon which relief may be granted, Veney must
> allege facts sufficient to overcome the presumption of
> reasonableness applied to prison policies.

**Veney**, 293 F.3d at 732 (citation omitted).

In the second PF&R, the magistrate judge concluded as
follows:

> The plaintiff has failed to present any evidence that
> the defendants have intentionally or purposefully
> discriminated against him because of his race,
> heritage, language, culture and spiritual beliefs. If
> anything, it appears that the plaintiff may have
> received special privileges which other segregation

22

> inmates do not receive, because of his relentless
> complaining.

(Sec. PF&R at 24).  Plaintiff objects.

In attempting to prove that he has been treated differently from others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination, plaintiff makes several allegations in his objections, the most serious of which are now summarized. First, he asserts that he has been spat upon and called "wetback."  (Objecs. at 24).  He does not charge any of the defendants with doing so.

Next, he states that a book was seized "by the defendants" but he has particularized neither the circumstances relating thereto nor shown how the named defendants bear responsibility.  Neither is it apparent how the seizure of the book resulted from animus.

Third, he states his requests to receive Taino/Arawak literature are denied, that he is prohibited from having Taino/Arawak feasts, and that, again, Christian television stations are provided to the inmate population, but not free

Internet programing of stations that carry information respecting his beliefs.[6]  (See Sec. Objecs. at 24).  The difficulty with these allegations is that they are short on details demonstrating that plaintiff is similarly situated to those who receive the benefits of literature, feasts, and religious programming.  For example, it is undisputed that plaintiff is in administrative segregation.  As a result of that status, he is apparently subject to certain restrictions.  Inasmuch as plaintiff's objections do not address the point, the court is left to speculate.

In any event, Warden Ballard has averred as follows: "To the extent a Taino-Arwak group would desire to plan and present . . . an event, such as is done by the Christian group Kairos, subject to security requirements, such events would be permitted." (Doc. 75-1 at 28).  There is no reason to suspect that promise would not be fulfilled, especially inasmuch as it appears in a sworn document.

---

[6]  Plaintiff asserts that he is compelled to pay a $3.00 monthly surcharge for television programming at the prison.  The court does not understand the $3.00 charge to apply only for Christian television programming.

It also appears to be the case that Warden Ballard has elected to treat those who belong to the Taino/Arawak faith as falling generally within the Native American religious tradition.  (See, e.g., Doc. 90-2 at 2 (September 29, 2008, memorandum from Warden Ballard to plaintiff stating "It is impossible to recognize and customize ceremonies for the individual participants who have declared their belief as the Native American religion especially considering that about one-fourth of our inmate population has declared themselves to practice the Native American Religion since MOCC went tobacco free."); Id. at 23 ("We consider your religion to be that of Native American.  We will not recognize individual tribes, i.e. Boriken - Taino.")).  That classification is not deemed arbitrary inasmuch as the view is shared by freely available, authoritative sources.  See, e.g., Carl Waldman, Encyclopedia of Native American Tribes 22 (3rd ed. 2006) ("This book for the most part discusses Native Americans in the continental United States and Canada.  Of course, there were and still are many other Indian peoples throughout the Americas, each group with its own complex culture and history.  One example with the people known as the Arawak . . , or Taino . . . . The Arawak lived throughout much of the West Indies, the archipelago, or

chain of islands, stretching from the southern tip of Florida to the northern tip of South America."); http://en.wikipedia.org/ wiki/ Carib people ("As with the Arawaks and other Native Americans, the Carib smoked tobacco in the rituals of their religion.").

Having considered the entirety of the record in the light most favorable to plaintiff, the court concludes that no rational trier of fact could find in plaintiff's favor as to whether he has been treated differently from others with whom he is similarly situated and as to whether the unequal treatment was the result of intentional or purposeful discrimination. He has likewise failed to show the unreasonableness of any prison policies about which he complains. The court, accordingly, ORDERS that defendants' motion for summary judgment as to the equal protection claim be, and it hereby is, granted.

C.    First Amendment Retaliation Claim

Plaintiff asserts that defendants have retaliated against him as a result of the exercise of his right to pursue prison grievances and this civil action. The magistrate judge

concluded that plaintiff failed to prove retaliation as a matter of law.  Plaintiff objects.

In <u>Crawford-El v. Britton</u>, 523 U.S. 574, 592 (1998), the Supreme Court observed that the First Amendment shields prisoners from retaliation for protected speech.  In <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676 (4th Cir. 2000), it was stated as follows:

> [A] § 1983 retaliation plaintiff must establish three elements in order to prove a First Amendment § 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. Third, the plaintiff must demonstrate that a causal relationship exists between . . . [his] speech and the defendant's retaliatory action.

<u>Id.</u> at 685.  Implicit in these three elements is that a plaintiff must offer proof sufficient to give rise to a reasonable inference of retaliatory action arising out of his resort, as here, to the prison grievance process or a federal civil rights action.

In support of this claim, plaintiff relies first upon his assertion that his mail is being intercepted and interfered with.  For the reasons discussed under section III.A.4,

27

plaintiff fails to raise a genuine issue of material fact
concerning the retaliatory interception of, or interference
with, his mail.  He next asserts that false and exaggerated
disciplinary charges were filed against him for a thank you note
he sent to "the Christian Chaplain."  (Objecs. at 30).  He does
not direct the court to that portion of the record where the
note might be found.  He next cites as evidence of retaliation a
letter he received from Senior Assistant Attorney General
Houdyschell.  He asserts the letter promised plaintiff would be
released from administrative segregation if he voluntarily
dismissed this civil action.  The letter provides materially as
follows:

> Finally, as to your settlement offer, I have
> spoken with Warden Ballard, and he rejects your offer
> but makes you the following counterproposal: In
> exchange for dismissal of all of your pending suits
> and actions in the court of claims and other forums,
> including your federal claim, the Warden will waive
> your completion of the Quality of Life program and
> release you to the general population.

(Doc. 90-8 at 16).  This constitutes no more than a counteroffer
of settlement.  Evidence of settlement offers is inadmissible.
Fed. R. Civ. Proc. 408(a).[7]  Finally, plaintiff  complains that

---

[7] Were the law otherwise, the letter from Senior
Assistant Attorney General Houdyschell would nevertheless
not give rise to an inference of retaliation.  It is
evident that settlement was not the primary purpose of
the letter.  Four of the five paragraphs found therein

defendants have failed to "meaningfully review" his segregation

status every 30 days.[8]  The failure to more adequately describe

the claim hinders the court's review of the matter.

---

respond to unrelated inquiries made by plaintiff.  The
two sentences offered by Houdyschell reflect Warden
Ballard's willingness to bend if plaintiff was equally so
inclined.  Warden Ballard was entitled to keep plaintiff
in administrative segregation.  Inasmuch as his
insistence upon doing so was proper, so too would be his
willingness to forego that legal right in favor of
resolving pending litigation.  This is not apparently a
case where plaintiff suffered enhanced deprivations
following declination of a settlement offer.  <u>Compare
Harris v. Fleming</u>, 839 F.2d 1232 (7th Cir. 1988) (finding
genuine issue of material fact where inmate met with
assistant attorney general "[t]hey talked about a
settlement, but Harris refused to settle[, and] [t]he
next day Harris lost a job he had as a foodhandler and
three days later he was transferred to a cell with a
known homosexual.").  The timeline and circumstances in
this action are quite different.

   [8] Plaintiff asserts generally that he does not belong
in segregation but admits to having an edged weapon in
his possession "[s]everal years ago."  (Objecs. at 32).
This is an important concession, as is the fact that
plaintiff appears to minimize the reasons behind his
unsuccessful encounters with MOCC decision makers.
Assuming plaintiff was able to demonstrate a prima facie
case of First Amendment retaliation, the burden would
shift to defendants to offer legitimate,
nondiscriminatory reasons for any of the adverse actions
taken against him within the applicable limitations
period.  Our court of appeals' decision in <u>Russell v.
Microdyne Corp.</u>, 65 F.3d 1229 (4th Cir. 1995) provides as
follows:

   What is notable about both the "single motive"
   indirect evidence cases under <u>McDonnell Douglas</u> and
   the "mixed-motive" cases under <u>Price Waterhouse</u> is
   that, in both instances, the parties challenge the

Having considered the entirety of the record in the light most favorable to plaintiff, the court concludes that no rational trier of fact could find in plaintiff's favor as to the First Amendment retaliation claim.  The evidence offered by plaintiff amounts to no more than a scintilla of proof, which is insufficient to withstand summary judgment.[9]  The court, accordingly, ORDERS that defendants' motion for summary judgment as to the First Amendment retaliation claim be, and it hereby is, granted.

---

underlying motivation or motivations for the disputed employment action. Although the differences between the two types of cases are relatively minor from the parties' perspectives, in terms of their evidentiary tasks, the difference in analysis from the perspective of the fact-finder is significant: in the indirect evidence cases, the employer offers a legitimate, non-discriminatory reason for the action, and for a plaintiff to win the fact-finder must find that discriminatory animus, rather than the offered reason, was the true reason for the action . . . .

Id. at 1237.

[9] Plaintiff offers other objections that do not require extended discussion.  For example, he objects to the magistrate judge reciting details respecting his conviction.  The few sentences offered by the magistrate judge constitutes nothing more than background information, which the court has not relied upon in any way in adjudicating this matter.

IV.

Based upon the foregoing discussion, it is ORDERED as follows:

1. That the proposed findings and conclusions found in both the first and second PF&Rs be, to the extent not inconsistent with the foregoing, adopted and incorporated herein;

2. That plaintiff's "urgent motion for temporary restraining order," be, and it hereby is, denied;

3. That defendants' motion for summary judgment be, and it hereby is, granted;

4. That this civil action be, and it hereby is, dismissed with prejudice and stricken from the docket.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and plaintiff.

ENTER: February 10, 2012

John T. Copenhaver, Jr.
United States District Judge